In the Matter of the Arbitration of Controversies between Frank G. BARRETT, Bertram A. Powers and James A. McCann, Union-Appointed Trustees of Typo-Publishers' Welfare Fund, Petitioners,

and

A. V. MILLER, William Mapel and C. Raymond Hulsart, Association-Appointed Trustees of Typo-Publishers' Welfare Fund, Respondents.

United States District Court
S. D. New York.

Oct. 16, 1958.

Sheehan & Harold, New York City, for petitioners.

Townley, Updike, Carter & Rodgers, New York City, for respondents. John R. Schoemer, Jr., New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

Petitioners, who are the three Union-appointed trustees of the Typo-Publishers' Welfare Fund, apply to this court for the appointment of an impartial umpire to resolve a deadlock between themselves and the three trustees appointed by the employers' Association.

The Typo-Publishers' Welfare Fund was established in 1953 by New York Typographical Union No. 6 and the Publishers' Association of New York City representing principal New York City newspapers. It took the form of a trust agreement dated February 27, 1953 between these two parties and six named trustees, three of whom were designated by the Union and three by the employers' Association. Like the many similar plans now in operation, the agreement was the fruit of collective bargaining between Union and employers and stemmed from Section 302(c) (5) of the Labor Management Relations Act, 29 U.S.C.A. § 186(c) (5).

The purposes of the fund are to provide welfare benefits to the typographical employees covered by the Union's collective bargaining agreements with the Association and its members, and with other employers not members of the Association who choose to join the plan under its terms. These benefits include life, disability, surgical and hospitalization coverage.

The funds in the hands of the trustees consist largely of contributions from the employers who now pay over to the fund 73 cents per shift worked per employee, to a maximum of five shifts in a week. Benefits are provided to approximately 3,500 employees, dependents and beneficiaries and for the fiscal year ended February 28, 1957 total contributions amounted to approximately $620,000.

The deadlock between the two groups of trustees arises from a proposal by the Union group that life and disability coverages under the trust be underwritten by the fund itself on a self-insurance basis rather than through group policies purchased from insurance carriers as has been done up to now. The employer trustees have opposed such a course.

On April 29, 1957, by unanimous action of the trustees, Martin Siegal & Company, Inc., who are specialists in the field of employee welfare funds, were engaged to survey the possibilities of self-insurance for this fund. They reported to the trustees that some twelve to fourteen thousand dollars annually could be saved if life insurance, disability and surgical benefits were provided through appropriate self-insurance by the fund itself. They also reported that it was not feasible to provide hospitalization benefits on a self-insurance basis.

At the trustees' meeting on November 19, 1957 the Union trustees, on the basis of the Siegal report, proposed a resolution which would have transferred the fund on March 1, 1958 to a self-insurance basis for life and disability insurance which are now covered by a group policy expiring on February 28, 1958.

The three Union trustees voted in favor of the resolution and the three employer trustees voted against it, thus creating the deadlock.

Article 10(e) of the trust agreement provides that in the event of a deadlock "upon any question coming before the trustees for decision", and the failure of the trustees to agree on an impartial umpire, such an umpire shall be appointed by this court.

This is in accord with Section 302(c) of the Labor Management Relations Act, 29 U.S.C.A. § 186(c), permitting agreements of this nature, if, among other things,

" * * * in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an

impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, * * * ."

The trust agreement also provides that the trust was "created and accepted by the Trustees" in New York and that "all questions pertaining to its validity, construction and administration" shall be determined in accordance with the laws of New York.

The petition contains no jurisdictional allegations and there is no diversity jurisdiction. However, jurisdiction is derived directly from Section 302(c) (5) of the Labor Management Relations Act and the application is properly before me. See Copra v. Suro, 1 Cir., 236 F.2d 107.

■ The collective bargaining agreement pursuant to which the fund was created provided that the parties "shall negotiate a trust agreement * * * in accordance with the provisions of Section 302 of the Labor Management Relations Act of 1947 * * * ". The resulting trust agreement refers in turn to the collective bargaining agreement and derives therefrom. The provision in the trust agreement for the appointment of an impartial umpire by this court is expressly authorized and, indeed, made mandatory by Section 302(c) (5). Congress plainly vested that jurisdiction over this phase of the controversy in the federal courts, and had the constitutional power to do so. Textile Workers Union of America v. Lincoln Mills of Ala., 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972; Copra v. Suro, supra.

With jurisdiction thus grounded federal law applies in determining the question presented entailing "the creation of a body of federal common law of welfare trusts (springing from the terms of § 302(c) (5))" as Chief Judge Magruder

pointed out in Copra v. Suro 236 F.2d 107, at 115. See, also, Textile Workers Union of America v. Lincoln Mills of Ala., supra, p. 449. The federal climate is highly favorable to arbitration and leaves to the arbitrators broad power to determine questions in controversy regardless of their ease or difficulty of solution. Petition of Ropner Shipping Co., D.C.S.D.N.Y., 118 F.Supp. 919; Reconstruction Finance Corp. v. Harrisons & Crosfield, 2 Cir., 204 F.2d 366, 37 A.L.R. 2d 1117, certiorari denied 346 U.S. 854, 74 S.Ct. 69, 98 L.Ed. 368. Cf. Kulukundis Shipping Co., S/A, v. Amtorg Trading Corp., 2 Cir., 126 F.2d 978, 985. Here, however, a complication arises because of the stipulation of the parties in the trust agreement that "all questions pertaining to its validity, construction and administration" are to be determined by New York law.

■ It is doubtful whether the federal courts would give effect to such a provision under circumstances where reference to the law of a particular state might defeat the Congressional policy enunciated in Section 302 as to what must be left to arbitration by the umpire to be appointed in the event of deadlock. Here, however, the reference is not to the law of a state which imposes common-law limitations upon arbitration. Cf. Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199. New York does not adhere to the strict common-law view on arbitration, and its law is sufficiently broad to require the granting of the present application.

Therefore it is unnecessary to decide, whether what is perhaps the more liberal federal law should be applied since I am prepared to hold that the application should be granted even under New York law.

■ The employer trustees take the position that the court is not authorized to appoint an impartial umpire in the circumstances of this case, and that in any event such an appointment would be futile. They assert that there is no dead-

lock "upon any question coming before the trustees for decision" as the trust agreement requires, or "on the administration of such fund" as the Act contemplates as a prerequisite to such appointment. They maintain that under the trust agreement insurance benefits may be provided only through policies purchased from insurance carriers and self-insurance is precluded. They argue that the fund could not become a self-insurer without amendment of the trust instrument with the consent of both the employer· Association and the Union. They point out that the employer Association has unequivocally taken the position that it will refuse to consent to such an amendment.

Thus, they conclude that since the trustees have no power under the agreement to provide self-insurance, and since the refusal to amend is not an arbitrable controversy under the agreement, there is nothing to be arbitrated or which calls for the appointment of an umpire.

Moreover, they assert that the operation of the fund on a self-insured basis would constitute carrying on an insurance business without a license in violation of the New York Insurance Law, McKinney's Consol. Laws, c. 28. They also contend that Section 302(c) (5) does not permit welfare funds to self-insure and that therefore self-insurance would violate the prohibition of Section 302(c) of the Labor Management Relations Act against the payment of any money or thing of value by any employer to any "representative of his employees", except under the circumstances permitted by Section 302(c). The respondents thus conclude that since the proposal of the Union trustees could not be carried out without violating the law, the appointment of an umpire would be futile.

No doubt, with the exception of the wisdom of the course sought to be pursued, most matters at issue between the trustees would be proper subjects for decision by the courts in appropriate actions or proceedings which raised them.

However, both the statute and the agreement of the parties contemplate that disputes be resolved in the first instance differently, i. e. by the impartial umpire to be appointed by the court. It is not for the court to undertake to settle the disputes itself or to narrow the field of dispute which should be submitted to the umpire in the absence of compelling reasons.

There is no doubt that there is a deadlock between the two groups of trustees on each of the issues raised here by the respondents. These issues include not only the wisdom and desirability of the proposal of the Union trustees, but also the construction to be given to the agreement and such questions of law as might impede or prevent the proposal in its present, or in modified, form from being carried into effect. All of them are before the trustees "for decision".

The agreement provides that "any" such question shall be submitted to the umpire in the event of deadlock.

■ The province of an umpire or arbitrator comprehends questions of law and of the construction or interpretation of the agreement, as well as questions of fact or judgment. Such questions are not to be taken from him and determined instead by the court. S. A. Wenger & Co., Inc., v. Propper Silk Hosiery Mills, Inc., 239 N.Y. 199, 146 N.E. 203; Lipman v. Haeuser Shellac Co., 289 N.Y. 76, 43 N.E.2d 817, 142 A.L.R. 1088; Matter of Companie Francais Des Petroles (Pantapek Oil Co.), 279 App.Div. 851, 110 N.Y.S.2d 1, affirmed 305 N.Y. 588, 111 N.E.2d 645; Matter of Teschner (Livingston), 285 App.Div. 435, 137 N.Y.S.2d 901, affirmed 309 N.Y. 972, 132 N.E.2d 333; Matter of Potoker (Brooklyn Eagle), 286 App.Div. 733, 146 N.Y.S.2d 616; Matter of Acme Backing Corp. v. District 65, Distributive, Processing and Office Workers of America, 2 A.D.2d 61, 152 N.Y.S.2d 889; Tarello v. John A. Johnson Contracting Corp., Sup., 50 N.Y.S.2d 212, affirmed 268 App.Div. 893, 51 N.Y.S.2d 87, leave to appeal de-

nied 294 N.Y. 646; Freydberg Bros., Inc., v. Corey, 177 Misc. 560, 31 N.Y.S.2d 10, affirmed 263 App.Div. 805, 32 N.Y.S. 2d 129.

It is true that a claim may be "so unconscionable or a defense so frivolous" as to justify the court in refusing to appoint an arbitrator or to order the parties to proceed to arbitration. S. A. Wenger & Co., Inc., v. Propper Silk Hosiery Mills, supra, 239 N.Y. at page 202, 146 N.E. 203, at page 204. Cf. Matter of International Association of Machinists, Dist. No. 15, Local No. 402 v. Cutler-Hammer, Inc., 297 N.Y. 519, 74 N.E.2d 464. But that is not the case here. The controversy as to the wisdom of the self-insurance proposal is plainly bona fide. The question of whether or not the agreement permits self-insurance without amendment stems from that controversy. Resolution of that question requires construction of the agreement. Without in any way passing upon such construction, it is plain to me that the contention of the Union trustees as to construction is not so totally without merit as to be frivolous.

Nor is correctness of the employer trustees' contentions that carrying out the proposal would necessarily entail violation of law sufficiently clear to demonstrate that there is no tenable view to

the contrary, or to make the position taken by the Union trustees either unconscionable or frivolous.[1]

All these questions are factors to be taken into account by the umpire in reaching his decision on the proposal before him.

Or course, if the umpire's decision should be contrary to law the respondent trustees have their remedy. See Matter of Western Union Telegraph Co., 299 N.Y. 177, 86 N.E.2d 162; Publishers' Association of New York v. Newspaper & Mail Deliveries' Union of New York, 280 App.Div. 500, 114 N.Y.S.2d 401. But the court will not presume at this stage of the proceeding that the umpire will render a decision other than in accord with the law and with his best judgment after considering all aspects of the matter before him.

Finally, it may be noted that none of the questions presented here were before the umpire appointed to determine a previous controversy between these trustees. Any references to such questions in his decision are in no way binding here.

Petitioners' application for the appointment of an impartial umpire will be granted and an umpire will be designated in an order to be settled on notice.

1. 1956 Opinions of the Attorney General of New York, Nov. 21; Re 29 U.S.C.A. § 186(c) (5). In United States v. Ryan, 2 Cir., 232 F.2d 481, 483, it was pointed out that the "chief, if not only, purpose of the section [186] was to put a stop to practices that, if unchecked might impair the impartiality of union 'representatives' ". See, also, William Dunbar Co. v. Painters & Glaziers District Council, No. 51, D.C.D.C., 129 F.Supp. 417; United States v. Brennan, D.C.Minn., 134 F.Supp. 42, 48, affirmed 8 Cir., 240 F. 2d 253, certiorari denied 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed.2d 723.